The Form 21 and 26 Agreements, having been approved by the Commission, constitute Awards of record and the same are incorporated herein by reference. The parties at the hearing before the Deputy Commissioner stipulated to all the medical records of Drs. Bond, Kelly, and Pikula and subsequent to the hearing, they stipulated into evidence a videotape of plaintiff's activities in December 1991.
Upon review of all of the competent and convincing evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or to substantially amend the award, the Full Commission AFFIRMS and ADOPTS from the Opinion and Award of the Deputy Commissioner, with minor technical modifications, as follows:
FINDINGS OF FACT
1. Plaintiff, who is 40 years old and has a tenth grade education, worked for defendant employer as a truck driver from January 1975 through March 20, 1989. Duties of that job involved his driving a truck to various chicken farms where he and a co-employee loaded boxes of eggs which they hauled to hatcheries. Plaintiff was required to lift 35-60 pound boxes of eggs, some of which he stacked over his head by standing on his tip toes. Plaintiff and the co-employee regularly loaded about 670 boxes daily.
2. In 1985 plaintiff experienced some aching and pain in his neck for which he was seen by a chiropractor and by reason of which he missed about 2-3 weeks from work. On December 2, 1988, plaintiff was seen by Dr. Adams for complaints of pain in his neck radiating to his shoulder and with a history of having pulled his neck and upper back while lifting crates of eggs. X-rays at that time established the existence of early degenerative changes between C6-C7 and Dr. Adams prescribed medication and an injection.
3. Plaintiff sustained the admittedly compensable injury by accident giving rise hereto on March 20, 1989, at which time he experienced a sharp burning sensation-like pain in his neck as he lifted a box of eggs from a conveyor belt to stack on the truck.
4. Plaintiff's supervisor subsequently sent him to the company physician, Dr. Bond, under whose care he came on March 21, 1989. X-rays revealed degenerative joint disease at C6-C7 and Dr. Bond thereafter prescribed medications, physical therapy, and traction at home.
5. Plaintiff, who was not satisfied with Dr. Bond's care, requested and received permission from defendants for him to be seen by Dr. Adams for a second opinion which he did on April 25, 1989 with complaints of neck and left shoulder and arm pain. Following examination, Dr. Adams prescribed medication and an injection and advised plaintiff to reduce his lifting and reaching, particularly lifting and reaching overhead or to high levels.
6. Plaintiff, who continued to work for defendant employer following the injury by accident, was next seen by Dr. Adams on May 15, 1989 with complaints of heavy lifting at work causing marked aggravation of his symptoms. Dr. Adams prescribed medication and advised him to reduce his activity and stress on his neck, that lifting above shoulder level would aggravate his degenerative disc disease, and that he should change from that type lifting. When seen by Dr. Bond on June 16, 1989, plaintiff reported that he had been continuing to lift heavy weights and that it had continued to aggravate his neck and shoulders with some radiation into the upper extremities. Additional physical therapy was prescribed.
7. By a Form 21 Agreement which is dated June 29, 1989 and was approved by the Commission on July 24, 1989, defendants admitted liability for the injury by accident of March 20, 1989 and undertook to pay compensation benefits for temporary total disability beginning June 19, 1989. Thereafter, by Commission approved Form 26 Agreements, defendants undertook to pay partial disability compensation beginning October 10, 1989 and then, temporary total disability benefits for a period of one and three-sevenths weeks beginning October 20, 1989.
8. In July 1989 a bone scan performed at Dr. Adams' direction confirmed a degenerative inflammatory process at C6-C7. In August 1989 plaintiff was examined and evaluated by Dr. Kelly on referral from Dr. Bond and a cervical myelogram performed in August revealed no evidence of herniated disc or spinal stenosis. In September 1989, Dr. Kelly advised plaintiff not to engage in heavy manual labor or overhead work and Dr. Bond concurred therewith.
9. On or about October 30, 1989 plaintiff returned to work for defendant employer in a hatchery job which required him to transfer eggs from incubators and dump them into plastic trays which were about as heavy as a box of eggs. He did this job for about one week and because he complained to supervisors about additional neck pain when performing this job, he was transferred to a job on the blood testing crew in the vaccination area where he caught chickens.
10. In order to catch chickens, plaintiff got on his knees on the floor where he crawled around and grabbed chickens by their wings and then lifted them and handed them to co-employees on the line. This work activity was essentially continuous throughout the work shift.
11. Plaintiff thereafter worked as a chicken catcher from about November 7, 1989 through January 31, 1991 except that he was on three weeks lay-off in September and again in October 1990, he did not work in November 1990 during which time he was on vacation and holiday leave, and he was on lay-off from December 7, 1990 until returning to work January 2, 1991. Those layoffs were occasioned by lack of work due to a decline in the number of breeder flocks and attendant services on chickens which had necessitated defendant employer reducing the size of its crews beginning in 1988. After deducting the periods of time that plaintiff did not work in 1990, a period of 14 weeks, there remains a period of 38 and one-seventh weeks during which he earned $10,623.53 or an average weekly wage of $278.51 whereas at the time of the injury by accident, he earned an average weekly wage of $303.85.
12. During the above-referenced time that plaintiff worked as a chicken catcher, he continued to experience cervical problems for which he was seen by Dr. Bond in January 1990 and again in January 1991. In addition, he was seen by Dr. Adams in November and December 1989 and from January through April 1990 and was thereafter next seen by him in January 1991. An MRI performed in May 1990 at Dr. Pikula's direction revealed some herniation of disc material with impingement at the C6-C7 level. In February 1991, plaintiff was again examined and evaluated by Dr. Kelly who rated him as having five percent permanent partial disability of the cervical spine.
13. Plaintiff came under the care of Jeffrey Aita, D.C., in December 1990 and was thereafter treated through November 1991 during which time he complained of neck pain and upper back pain on almost every visit. Chiropractor Aita rated plaintiff as having 20 percent permanent partial impairment of the cervical spine. Plaintiff did not seek defendants' authorization to be treated by Chiropractor Aita and he first sought Commission approval thereof at the time of the hearing on February 24, 1993. Plaintiff did not seek Commission approval within a reasonable time after his selection of Chiropractor Aita to render treatment.
14. Because of a continuing reduction in defendant employer's business, plaintiff was permanently laid off on January 31, 1991. Evidence to the contrary is not accepted as credible or convincing.
15. Plaintiff thereafter drew unemployment benefits at the rate of $180.00 per week from February 1, 1991 to May 27, 1991. In about June and July 1991, plaintiff went to the Employment Security office where he filled out applications for employment at a total of about four businesses. Other than this brief, sporadic effort, plaintiff has made no attempt to locate public employment since January 31, 1991.
16. Instead of seeking employment in the public sector, plaintiff obtained a building permit in March 1991 for the construction of a three bay garage on his property so that he could go into business for himself providing a car clean-up service for automobile dealerships and individuals. In order to do so, plaintiff and his wife borrowed $40,000.00 from her mother and step-father for the garage and related expenses involved therewith. Inferentially, plaintiff was not anticipating returning to work for defendant employer or for some other employer.
17. Plaintiff thereafter performed overhead carpentry work and overhead painting and he climbed ladders and worked on the roof during the construction of his garage. He performed this overhead work despite his having been previously advised by physicians not to engage in overhead activity. When seen by Dr. Adams on June 19, 1991, plaintiff reported that he had been doing reasonably well until the last few weeks and that he had been doing some overhead carpentry work and was having a flare-up of his neck pain. Treatment rendered included an injection and pain medication. Plaintiff thereafter remained under Dr. Adams' care and in November 1991, he was seen by Dr. Adams for tendonitis in the elbow as well as for neck and shoulder pain. On June 2, 1993, Dr. Adams rated him as having 15 percent permanent partial impairment of the cervical spine. Plaintiff, who last saw Dr. Adams on June 28, 1993, remains under his care.
18. In February 1993 plaintiff was examined and evaluated for bilateral carpal tunnel syndrome by Dr. Rodger on referral by Dr. Adams and in March 1993 he was also examined and evaluated by Dr. Benjamin for bilateral carpal tunnel syndrome. Plaintiff reported to Dr. Benjamin that he lifted objects and performed repetitive manual tasks in his car clean-up business.
19. In November 1991, a private investigator observed plaintiff at his garage engaged in various activities which included, among others, carrying a container of fluid and emptying it which appeared to be oil, jacking up a vehicle, crawling underneath it, and working inside the hood area of a vehicle and under the front end of a vehicle. The Full Commission does not accept as credible or convincing plaintiff's evidence that he only washed and waxed cars.
20. In November 1991, plaintiff obtained a permit to construct a carport on his property and in December 1991 a private investigator observed him shoveling cement down the cement truck chute into a wheelbarrow, pushing the wheelbarrow of cement, spreading cement for the floor of the carport, and shoveling dirt.
21. Plaintiff had admitted gross revenue of $3,759.00 in 1991 and $6,690.00 in 1992 from his car clean-up business but after deduction of expenses, including $300.00 monthly interest which he has paid on the $40,000.00 loan since May 1991, he has not realized a profit. That clean-up business is not reflective of his wage earning capacity. Despite losing money in the business and despite his being unable, on occasions, to work for several days at a time due to his shoulders hurting when he washed and waxed cars and due to his arms and hands being numb and swollen, he has not sought employment elsewhere.
22. The injury by accident of March 20, 1989 aggravated and thereby made more painful plaintiff's preexisting cervical degenerative disc disease, a degenerative process which had been going on for several years and which was caused by the natural process of wear and tear and aging and increased wear and strain due to his years of repetitive lifting, especially to heights. Ultimately, the degenerative disc disease at C6-7 thereafter progressed from inflammation to a herniation of some disc material at that level. Although his degenerative disc condition periodically flared up and was aggravated by reason of his work activity at defendant-employer and his later work activity and physical activity outside of that employment, his condition between late 1989/early 1990 and June 1993 did not change substantially. While there was a diagnostic testing change from 1989 to May 1990, when some herniation of disc material was revealed, his complaints and restrictions have remained about the same since late 1989/early 1990.
23. As a result of the injury by accident giving rise hereto, plaintiff's wage earning capacity was diminished from $303.85 per week which he earned at the time of the injury by accident to an average weekly wage of $278.51 beginning October 30, 1989 and continuing through January 31, 1991 and thereafter. His earnings at defendant employer during 1990, which amounts to an average weekly wage of $278.51, are reflective of and establish his wage earning capacity since October 30, 1989.
24. Plaintiff obtained maximum medical improvement from the injury by accident giving rise hereto and the treatment rendered therefore on June 2, 1993. The credible and convincing evidence fails to sufficiently establish to the undersigned that any percentage of permanent partial impairment which he sustained to the cervical spine was due to the injury by accident of March 20, 1989.
25. Plaintiff's bilateral carpal tunnel syndrome and tendonitis conditions are not causally related to the injury by accident giving rise hereto.
26. Plaintiff failed to engage in reasonable efforts after January 31, 1991 to locate and secure employment which he was capable of performing.
* * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission makes the following additional
CONCLUSIONS OF LAW
1. As a result of the injury by accident giving rise hereto, plaintiff was partially disabled from October 30, 1989 through January 31, 1991 for which he is entitled to compensation at the rate of $16.89 per week, that being 66 and two-thirds percent of the difference between the average weekly wage which he earned at the time of the accident and which he was able to thereafter earn. In addition, plaintiff is entitled to compensation at said rate of $16.89 per week beginning February 1, 1991 and continuing thereafter, subject to the 300-week limitation set forth in N.C.G.S. 97-30 and subject to a change of condition. However, on and after February 1, 1991 plaintiff failed to engage in reasonable efforts to locate employment which he was capable of performing. N.C.G.S. 97-30
and N.C.G.S. 97-47, further refusal of which shall lead to suspension of his benefits upon Commission order. He shall cooperate with rehabilitation efforts.
2. Inasmuch as the sum of plaintiff's partial disability benefits and his unemployment benefits for the weeks from February 1, 1991 to May 27, 1991 does not exceed two-thirds of his average weekly wage computed pursuant to N.C.G.S. 97-2(5), defendants are not entitled to any credit by reason of plaintiff's receipt of unemployment benefits. N.C.G.S. 97-42.1.
3. Inasmuch as plaintiff did not seek Commission approval of his selection of Chiropractor Aita to treat him within a reasonable time after he came under said Chiropractor's care, defendants are not liable for the cost of treatment rendered by said Chiropractor. N.C.G.S. 97-25 and Scofield v. Tea Co.,299 N.C. 582, 264 S.E.2d 56 (1980).
* * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following
ORDER
1. Subject to counsel fee hereinafter approved, defendants shall pay to plaintiff compensation at the rate of $16.89 per week beginning October 30, 1989 and continuing through January 31, 1991 and thereafter, subject to the 300-week limitation set forth in N.C.G.S. 97-30 and subject to a change of condition prescribed by N.C.G.S. 97-47. As much of said compensation as has accrued shall be paid in a lump sum without commutation. Plaintiff shall engage in reasonable efforts to locate employment, further refusal of which shall lead to suspension of his benefits upon Commission order.
2. A reasonable attorney fee in the amount of 25 percent of the compensation benefits payable herein is hereby approved for plaintiff's attorney. Said attorney fee shall be paid out of the accrued benefits and out of the benefits which will hereafter accrue by defendants making direct payment to plaintiff's counsel of every fourth week of compensation benefits payable under the terms of this Opinion and Award.
3. Defendants shall pay all medical expenses incurred, except those of Jeffrey Aita, D.C., by plaintiff for treatment of the injury by accident giving rise hereto when bills for the same shall have been submitted through defendant carrier to the Industrial Commission and approved by the Commission.
4. Defendants shall pay the costs.
This the ____________ day of _____________ 1996.
 S/ __________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ _______________ LAURA K. MAVRETIC COMMISSIONER
S/ ______________ J. RANDOLPH WARD COMMISSIONER
JHB/nwm 05/21/96